The Honorable John C. Coughenour

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

Plaintiff,

v.

MUKUND MOHAN,

Defendant.

No.  CR21-0041JCC

GOVERNMENT'S SENTENCING
MEMORANDUM

Comes now the United States of America, by and through Tessa M. Gorman, Acting United States Attorney for the Western District of Washington, Andrew C. Friedman, Assistant United States Attorney for said District, Joseph Beemsterboer, Acting Chief, Fraud Section, Criminal Division, United States Department of Justice, and Christopher Fenton, Trial Attorney for said Section, and files this Government's Sentencing Memorandum.

## I.   INTRODUCTION

Defendant, Mukund Mohan, is before the Court for sentencing following his guilty plea to one count of wire fraud, in violation of 18 U.S.C. § 1343, and one count of money laundering, in violation of 18 U.S.C. § 1957.  Mohan is scheduled to be sentenced at 9:00 a.m. on July 20, 2021.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## II.   BACKGROUND

### A.  The COVID-19 Pandemic and the Paycheck Protection Program

In early 2020, the COVID-19 pandemic spread rapidly across our country.  What started as a public-health crisis rapidly also become an economic crisis.  Large parts of the economy were shut down, businesses shuttered, and workers lost their jobs.  By April 2020, the unemployment rate in the United States had reached 14.8%, Congressional Research Service, Unemployment Rates During the COVID-19 Pandemic, fas.org/sgp/crs/misc/R46554.pdf, and millions of businesses faced the risk of failing.

To respond to the economic fallout, and prevent even worse disaster, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the CARES Act).  Pub. L. No. 116-136, 134 Stat. 281 (2020).  One of the goals of the CARES Act was to help businesses make payroll and pay operating expenses (and thereby avoid failure).  To that end, the CARES Act created a new government program, the Paycheck Protection Program (the PPP), to enable the issuance of loans, that ultimately could be forgivable, to small businesses in operation as of February 2020.  *See* Presentence Report ¶ 9 [hereinafter, PSR].

Under the PPP, loans were processed and funded by participating lenders.  *See id.* The loans were guaranteed by the Small Business Administration (the SBA), and ultimately would be forgiven if borrowers spent the loan proceeds on permissible expenses, including spending a substantial percentage on payroll.  *See id.*  To qualify for a PPP loan, a business was required to submit an application, and supporting documentation, that established, among other things, the number of persons employed by the business, and the amount of the business' payroll expenses.  *See id.* ¶ 10.

The CARES Act originally appropriated $349 billion for the PPP.  *See id.* https://www.americanactionforum.org/research/tracker-paycheck-protection-program-loans/.  This money was exhausted by April 16, 2020, causing the program to shut down for a time.  Congress appropriated another $320 billion to fund additional loans

GOVERNMENT'S SENTENCING MEMORANDUM/MOHAN (No. CR21-0041JCC) - 2

1  (sometimes referred to as "round two") through August 8, 2020.  (A third round of

2  funding followed in 2021.)

3  **B. Mukund Mohan's PPP Fraud**

4      Although many Americans' economic security, and even economic survival, were

5  threatened by the COVID-19 pandemic, Mohan was *not* one of those people.  Mohan, a

6  trained software engineer, previously had worked at Cisco, Microsoft, and Amazon, and

7  was employed in 2020 as the Chief Technology Officer of Build Direct, a Vancouver,

8  British Columbia, business.  *See id.* ¶¶ 51-53, 57-58, 60.  Mohan's wife worked at

9  Microsoft.  Between the two of them, they earned more than $500,000 per year.  *See id.*

10  ¶¶ 70, 76.  And, they owned assets totaling more than $7 million (including two houses in

11  Clyde Hill, each worth more than $2.5 million).  *See id.* ¶ 76.  Even after deducting the

12  value of the mortgages on those houses, they had a net worth of more than $5 million.

13  *See id.*

14      Mohan, an executive at Build Direct, was not eligible for a PPP loan, because he

15  did not have any business with employees to whom he paid salaries (other, perhaps, than

16  himself and members of his immediate family).  *See* PSR ¶ 11.  Nevertheless, between

17  April 26, 2020, and June 2, 2020, Mohan submitted applications for eight PPP loans for

18  six different businesses, seeking a total of $5,533,182.  *See id.*  Mohan's loan applications

19  contained numerous lies, and were supported by documents he had forged.  For example,

20  ■  Mohan represented that each of the companies for which
21     he sought a PPP loan was in operation on February 15,
22     2020, and had employees to whom it paid salaries or
        independent contractors whom it paid for work.  This was
23     not true.  None of the companies had any significant
        operation, and none had any employees or independent
24     contractors.  *See id.* ¶ 12.

25  ■  For each company, Mohan created IRS Form 940s that
26     showed that the company had paid large amounts in
        salary, typically more than $1 million, to employees in
27     2019.  This also was not true.  The companies had not
28     paid the salaries shown, or the withholding to the IRS

GOVERNMENT'S SENTENCING MEMORANDUM/MOHAN (No. CR21-0041JCC) - 3

shown.  Instead, Mohan had forged the forms as part of the fraud.  *See id.* ¶ 13.

■  Mohan also created fake payroll reports that listed rosters of supposed employees for each company.  These included Mohan's fictional alter egos, such as Sam Perara (discussed below).  But, fictional or real, none of the people listed on the rosters were actually so employed. *See id.*

Mohan's fraud became increasingly sophisticated as it proceeded.  Mohan initially applied for loans for companies he previously had established, such as Zuput, Inc., which he incorporated in 2018 (but which had little if any economic substance).  Mohan then moved to incorporating new companies, such as Vangal, Inc., which he incorporated in April 2020, for the apparent sole purpose of perpetrating fraud.  And, Mohan ultimately progressed to purchasing two previously-established "shelf corporations" to commit his fraud.   "Shelf corporations" were less likely to attract suspicion, because they had been incorporated some time previously.  For example, in May 2020, Mohan purchased a company named Mahenjo, Inc., from Wyoming Corporate Services, Inc.  *See id.* ¶ 14. Mahenjo had not had any employees or business activities since 2018 (if it ever did).  *See id.*  Mohan then used this corporate shell to apply for a PPP loan, supporting the application with a forged IRS 940 for 2019, and fake payroll reports for February 2020 that list 24 employees.  *See id.* ¶ 15.

Mohan used an array of fake identities to perpetrate the fraud.  For example, Mohan represented to Endeavor Bank that "Mumo Patel," (a name derived, apparently, in part from the first two letters of Mohan's first and last names), was the CEO of Zuput. Mohan then corresponded with Endeavor Bank through the email account mumopatel@gmail.com in connection with Zuput's PPP loan application.  Similarly, Mohan represented that another invented individual, "Sam Perara," was associated with several of the companies for which Mohan submitted fraudulent loan applications.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   Mohan created an email account sam@vangal.com, and used that email account to

2   provide information that supposedly came from these companies.[1]

3       Six of the eight PPP loan applications that Mohan submitted were approved, with

4   the result that Mohan received a total of $1,786,537 in fraudulent loan proceeds.  *See id.*

5   ¶17.  Mohan left much of this money in the accounts that received the money, but

6   transferred more than $200,000 to an account at Robinhood.  *See id.* ¶ 17.  Mohan did not

7   actually spend much of the money, presumably, because (1) he did not have an

8   immediate need for the money, and (2) he planned later to submit fraudulent paperwork

9   claiming the money had been spent on legitimate business expenses and did not want

10  actually to spend the money until that paperwork was approved and the loans were

11  forgiven (since it would be risky to spend the money when he still might have to pay it

12  back).

13      Mohan did spend approximately $16,301.16 of the money.  Among other things,

14  Mohan spent approximately $4,000 from Zuput's Bank of America account – an account

15  in which 90% of the money was proceeds of a fraudulent $150,000 PPP loan that Mohan

16  gotten for Zuput – to purchase two shelf corporations.  Mohan then later applied for, and

17  obtained, fraudulent PPP loans for both of those companies.

18       On, July 22, 2020, the government executed seizure warrants on various bank

19  accounts controlled by Mohan and seized $1,770,055.84 (the total loan proceeds, less the

20  $16,201.16 that Mohan had spent).  *See* Plea Agreement ¶ 8.  Mohan would have been

21  arrested that same day, but he fainted when agents arrived at his residence with search

22  and arrest warrants.  As a result, he was taken for medical care, and permitted to self-

23  surrender thereafter.

24

25

26

---

27  [1] Mohan also used these fake identities to perpetrate additional fraud.  Mohan, who performed some consulting work
    with a consulting referral company called Coleman R.G., referred Coleman R.G. representatives seeking experts to

28  consult on projects for which Mohan lacked the credentials to "Mumo Patel" and "Sam Perara."  See PSR Sent. Rec.
    Masquerading as these men, Mohan provided the consulting advice, and billed R.G. Coleman for the work.  *See id.*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

### III.    PRESENTENCE REPORT

The Government has no objection to the facts or to the Sentencing Guidelines calculation contained in the Presentence Report.  The Presentence Report adopts the same calculation of Mohan's offense level that both parties agreed to recommend in the Plea Agreement.  *See* Plea Agreement ¶ 9.  Specifically, it recommends that the Court find that the following Sentencing Guidelines apply:

| | |
|---|---:|
| Base offense level (§ 2B1.1(a)(1)) | 7 |
| Loss > $1,500,000 (§ 2B1.1(b)(1)(I)) | +16 |
| Use of sophisticated means (§ 2B1.1(b)(10)) | +2 |
| Money laundering under 18 U.S.C. § 1957 (§ 2S1.1(b)(2)(A)) | +1 |
| Acceptance of responsibility (§ 3E1.1(a) & (b)) | -3 |
| Total Offense Level | 23 |

Based upon a Total Offense Level of 23 and a Criminal History Category of I, Mohan has an advisory sentencing range of 46-57 months.

### IV.  SENTENCING RECOMMENDATION

The Government recommends that the Court sentence Mohan to at least 36 months' imprisonment.  The Government believes this sentence appropriately balances the factors set forth in 18 U.S.C. §3553(a).

**1.**    **"The nature and circumstances of the offense."**  Mohan has committed an extremely serious offense.  During, perhaps, the worst economic crisis of our lifetimes, Mohan defrauded the government of more than $1.75 million (and he sought to defraud the government of as much as $5.5 million).  Mohan's offense is aggravated by multiple factors:

- First, Mohan was not threatened by the economic melt-down caused by COVID-19.  While others lost their jobs, savings, and businesses, Mohan was insulated from the crisis.  He and his wife remained employed at jobs paying them a total of more than $500,000 per year, with a total net worth of more than $5 million.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

- Second, Mohan did not merely steal from the government. Rather, Mohan stole from a program designed to try to save small businesses and their employees. This was a limited pool of money. Indeed, the first round of funding had run out approximately 10 days before Mohan filed his first fraudulent application, and there was no reason to think the second round would not also run out of money. Mohan's filing of millions of dollars of fraudulent PPP loan applications deprived people who actually and urgently needed PPP loans of the ability to get them.

- Third, Mohan's crime was not a momentary lapse, but rather a determined ongoing effort. Mohan filed eight separate fraudulent loan applications over a five-week period beginning April 26, 2020, and continuing until June 2, 2020. Each application required substantial work, including incorporating or purchasing a company (for all but the earliest applications), completing the actual loan application, and creating fraudulent tax forms and payroll reports to support the fraud. In addition, his *modus operandi* evolved over this time period, further demonstrating the time and effort he put into committing the fraud.

Defense counsel have suggested to the Probation Office that Mohan's offense is mitigated by the fact that Mohan did not spend much of the money that he stole, but rather left almost all of it in the accounts to which it was paid (or, sometimes, to which he had transferred it). That fact does not mitigate Mohan's offense. Rather, it makes it worse. First, it confirms that Mohan did not need the money, and that his crime was a product primarily of greed. Second, it likely reflects nothing more than the fact that Mohan was waiting until he could apply to have the loan forgiven before risking spending the money.

2.    **"The history and characteristics of the defendant."**

Mohan's history and characteristics cut both ways. Although Mohan has been productively employed throughout his adult life, appears to have been a good father to children (including two whom he adopted) and contributor to the community, and has no

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  prior criminal history, Mohan's statements about this offense are cause for concern.

2  Puzzlingly, Mohan was unable to explain to the Probation Office his motivation for his

3  crime and purported still to be "attempting to understand his own actions." *See* PSR

4  ¶ 21.  Even Mohan's letter to the Court falls short of actually explaining why he stole the

5  money that he did, and what he intended to do with it.  This lack of apparent

6  understanding, even a year after Mohan's arrest, coupled the nature of Mohan's crime –

7  and his willingness to take money that others needed in a time of grave crisis – raise

8  substantial questions about Mohan's true characteristics.

9       **3.**     **The need for the sentence to "reflect the seriousness of the offense," "to**

10  **provide just punishment," "to afford adequate deterrence," and "to protect the**

11  **public."**  A significant prison sentence is required to reflect the seriousness of Mohan's

12  crime, and to provide just punishment.  As previously noted, despite his personal wealth

13  and economic security, Mohan fraudulently applied for millions of, and received more

14  than $1.75 million, dollars that were intended to help protect those cast into crisis by the

15  COVID-19 pandemic.  That conduct merits a significant sentence.

16       Mohan's case is one where a significant sentence also is needed to provide

17  adequate deterrence, and to protect the public.  We still are emerging from the COVID-19

18  pandemic.  Massive amounts of money have yet to be funneled to their ultimate

19  recipients.  As that process continues, it is important that people understand that there are

20  serious repercussions for those committing fraud to steal money that should go to others.

21  If a wealthy tech entrepreneur can defraud a relief program of more than $1.7 million

22  without facing serious consequence, that message of deterrence will be undermined.

23       **4.**     **The kinds of sentences available.**   For the reasons already discussed, the

24  Government believes a sentence of imprisonment is needed in this case.

25       **5.**     **The sentencing range.**  The parties agree that the applicable sentencing

26  range is 46-57 months.  Defense counsel suggested to the Probation Office that the

27  46-57-month range overstates the seriousness of Mohan's conduct for various reasons.

28  None has merit.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    First, defense counsel suggested that the actual loss in the case is limited to the
2    $16,201.16 that Mohan spent.  The Guidelines are clear that money should only be
3    excluded from loss if it was returned before a government agency discovers an offense.
4    *See* U.S.S.G. § 2B1.1 comment. n.3(E)(i).  Had Mohan actually had a fit of conscience
5    and returned loan proceeds in June 2020, before his fraud was detected, Mohan might
6    properly argue for the lower loss amount.  But, just because law enforcement investigated
7    and acted quickly to seized fraud $1.75 million of fraud proceeds does not mean that that
8    should not be considered loss – only that law enforcement did an effective job.

9    Second, defense counsel suggested to the Probation Office that Mohan is being
10   treated harshly because he was forced to plead guilty to money laundering, thereby
11   increasing his offense level.  Although different cases have resulted in different charges
12   and pleas, Mohan is far from unique in pleading guilty to money laundering.  Numerous
13   other PPP defendant have pled guilty to, and faced sentencing ranges that included
14   adjustments for, money laundering.  *See, e.g., United States v. Brian Criss,* No. 20-68-
15   SDD-SDJ (M.D. La.) (defendant pled guilty to wire fraud and money laundering); *United*
16   *States v. Michael Douros,* No. 2:20-cer-00259 (D. Utah) (defendant pled guilty to bank
17   fraud, and money laundering, among other offenses).

18   Notably, too, Mohan's offense level was increased by only one level for money
19   laundering, because he was permitted to plead guilty to a violation of 18 U.S.C. § 1957.
20   *See* U.S.S.G. § 2S1.1(b)(2)(A).  Had Mohan been required to plead guilty to a violation
21   of 18 U.S.C. § 1956, based upon his use of proceeds of the fraudulent PPP loan to Zuput
22   to promote fraud by purchasing two shelf companies that Mohan then used to obtain two
23   subsequent fraudulent PPP loans, Mohan's offense level would have been increased by
24   two levels.  *See* U.S.S.G. § 2S1.1(b)(2)(B).  As a result, the one-level adjustment that
25   Mohan received actually understates Mohan's conduct.  Moreover, eliminating the
26   adjustment also would reduce Mohan's sentencing range by only five months to a range
27   of 41-51 months.  The 36-month sentence that the Government is recommending is below
28   even this range.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(206) 553-7970

**6.** **The need to avoid unwarranted sentence disparities among defendants.**

A sentence of at least 36 months is consistent with sentences in other PPP cases. Although there have been a relatively limited number of PPP cases sentenced so far, the Probation Office has collected a number of those cases in its Sentencing Recommendation.  A review of these and other PPP cases suggests that defendants who have committed substantial PPP frauds (that is, those measured in the hundreds of thousands to millions of dollars), generally have received sentences that are measured in years, and often have received sentences that approach or fall within the applicable sentencing Guidelines.

To take two examples, *United States v. Hines,* 1:21-cr-20011-MGC (S.D. Fla.), involved a defendant who applied for more than $13 million of fraudulent PPP loans, and received almost $4 million of such loans.  Hines was sentenced to 78 months' imprisonment, that is, slightly more than twice the at-least-36 months that the Government is recommending here for committing slightly more than twice as much fraud as Mohan committed.  *United States v. Tubbs,* No. 4:20-cr-00193-BSM (E.D. Ark.), involved a defendant who obtained two PPP loans totaling $1,933,262, an amount comparable to what Mohan received.  Tubbs spent $14,000 on debit card purchases and student loan payments, comparable to what Mohan spent, and the Government recovered all but that $14,000, a comparable situation to Mohan's case.  Tubbs was sentenced to 41 months' imprisonment, five months more than the minimum the Government is recommending for Mohan.

The Government notes that defense counsel argued to the Probation Office, and no doubt will argue to this Court, that the one PPP fraud case sentenced to date in this District, *United States v. Boake Zhang*, No. 2:20-cr-00169-RAJ (W.D. Wash.), where defendant was sentenced to just 60 days' imprisonment, counsels a lower sentence for Mohan.  But, as the Probation Office notes, *see* PSR Sent. Rec. at 7-8, the two cases are very different.  Mohan applied for more than $5.5 million of PPP loans, approximately three times more than the $1.6 million of PPP and other loans for which Zhang applied.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Mohan received more than $1.75 million of loans, more than 100 times the $16,500 Zhang received.  And Zhang's conduct was mitigated somewhat because Zhang acted out of fear of losing his job and livelihood.  Mohan's fraud offers no such mitigation.

For all of these reasons, Zhang's case is not a good comparable.  A sentence based on Zhang's case (which appears to be an outlier in any event) also would create the very disparity that the Court should seek to avoid.  By contrast, a sentence of at least 36 months' imprisonment will avoid or minimize disparities with other cases.

7. **The need to provide restitution to victims.**  As discussed in Part IV below, the Government anticipates that the victim banks in this case will be paid restitution by the restoration of the money seized by the Government.  As a result, the sentence that the Government is recommending also will ensure that restitution is paid to victims.

. . .

In sum, a sentence of at least 36 months balances the considerations set forth in 18 U.S.C. § 3553.  It will appropriately punish Mohan for stealing massive amounts of money from programs designed to save others from economic calamity (a danger that never threatened Mohan, whose income and wealth place him near the top 1% of Americans).  It will deter others from similarly defrauding programs that continue to provide a necessary lifeline to struggling Americans.  And, it will treat Mohan fairly relative to other defendants convicted of PPP fraud and sentenced to date.

## IV.  RESTITUTION AND FORFEITURE

As previously noted, the Government succeeded in seizing $1,770,055.84 of the money stolen by Mohan.  It is well established that forfeiture and restitution are separate and distinct parts of a defendant's sentence that serve different purposes, and that they both are mandatory.  *See, e.g., United States v. Torres,* 703 F.3d 194, 204 (2d Cir. 2012) (collecting cases); *United States v. Taylor,* 582 F.3d 558, 566 (5th Cir. 2009) (same).  As a result, the Government could seek to forfeit the seized money, and also seek a restitution order that Mohan would be required to pay out of his remaining assets.

To avoid such a potentially-overly-punitive outcome, the United States Attorney's Office has consulted the Department of Justice's Money Laundering and Asset Recovery Section (MLARS), which has the authority to transfer forfeited property to victims. MLARS has indicated that, if the Court imposes a $100,000 fine, which the parties agreed in the Plea Agreement jointly to recommend, MLARS would be inclined to grant restoration – that is, to apply the net proceeds of the forfeiture to satisfy Mohan's restitution obligation.

As a result, the Government recommends that the Court impose a fine of $100,000.  The Government also asks the Court to impose restitution in the amount of $1,786,351, the total amount of loans that Mohan obtained.  The Government expects that this amount will be almost entirely satisfied by the $16,301.16 that Mohan already has paid to the Court, plus the net proceeds of the forfeiture of the seized funds.

The Government notes that Mohan argued to the Probation Office, and likely will argue to the Court, that his payment of a $100,000 fine is sufficient punishment, and that he should receive a purely probationary sentence.  That is not the case.  First, the fine reflects a very small percentage (less than 2%) of Mohan's net wealth.  As a result, while not insignificant, it is a far lesser punishment for Mohan than it would be for someone less affluent.  Second, the fine is actually the product of the Government's willingness to orchestrate a consultation with MLARS and with MLARS' willingness to work to minimize the possible financial penalty to Mohan of facing both forfeiture and restitution. Third, as the Probation Office notes, wealthy defendants should not be permitted to buy their way out of imprisonment.  *See* PSR Addendum.

## V.  CONCLUSION

For the foregoing reasons, the Court should sentence Mohan to at least 36 months' imprisonment, to be followed by a three-year term of supervised release.  The Court also

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

should order Mohan to pay a $100,000 fine, $1,786,351 in restitution, and a $100.00 penalty assessment.

DATED:  this 13th day of July, 2021.

Respectfully submitted,

TESSA M. GORMAN
Acting United States Attorney

*s/ Andrew C. Friedman*
ANDREW C. FRIEDMAN

Assistant United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington  98101-1271
Telephone:    (206) 553-2277
Fax:             (206) 553-0882

JOSEPH BEEMSTERBOER
Acting Chief

*s/ Christopher Fenton*
CHRISTOPHER FENTON

Trial Attorney
Fraud Section, Criminal Division
Department of Justice